**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **DIANA HALVERSON, M.D.,** | |
| **Plaintiff,** | **MEMORANDUM DECISION AND** |
| | **ORDER** |
| **vs.** | |
| **UNIVERSITY OF UTAH SCHOOL OF MEDICINE, MICHAEL K. YOUNG, A LORRIS BETZ, M.D., DAVID BJORKMAN, M.D., STEPHEN HARTSELL, M.D., SUSAN STROUD, M.D., TODD A. ALLEN, M.D., JUDI SHORT, SCOTT SMITH, and JOHN DOES 1-5,** | **Case No.  2:06CV228 DAK** |
| **Defendants.** | |

This matter is before the court on (1) Defendant University of Utah's Motion to Dismiss;

(2) the Individual Defendants' Partial Motion to Dismiss; and (3) Defendant Scott Smith's

Motion to Dismiss Claims Against Him in His Individual Capacity.  A hearing on the motions

was held on May 29, 2007.   At the hearing, Plaintiff Diana Halverson, M.D. ("Plaintiff" or "Dr.

Halverson") was represented by Stephen W. Cook and Erik Strindberg.   Defendants University

of Utah School of Medicine (the "SOM"), Michael K. Young, A. Lorris Betz, M.D., David

Bjorkman, M.D., Stephen Hartsell, M.D., Susan Stroud, M.D., Todd A. Allen, M.D., Judi Short,

and Scott Smith in his official capacity only (collectively, the "Individual Defendants") were

represented by Morris O Haggerty.   Defendant Scott Smith ("Mr. Smith") was represented in his

individual capacity by Timothy D. Evans.   Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.   Since taking the motions under advisement, the court has further considered the law and facts relating to the motions.   Now being fully advised, the court renders the following Memorandum Decision and Order.

## I.  STANDARD OF REVIEW

### A.  MOTION TO DISMISS STANDARD

In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the factual allegations in the Complaint, if true, would entitle the plaintiff to a legal remedy.[1]  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Dismissal is appropriate only when "the plaintiff can prove no set of facts in support of [her] claims to entitle [her] to relief."  *Cottrell, Ltd. v. Biotrol Int'l, Inc.,* 191 F.3d 1248, 1251 (10th Cir. 1999); *Seamons v. Snow,* 84 F.3d 1226, 1231 (10th Cir.1996).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Sutton v. Utah School for the Deaf and Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting *Miller v. Glanz,* 948 F.2d 1562, 1565 (10th Cir.1991)).  The court must accept all well-pleaded facts as true, construe those facts liberally in a light most favorable to the plaintiff, and

---

[1]  The court recognizes that Defendants, in opposing Plaintiff's Motion for a Temporary Restraining Order, had submitted significant evidence regarding the reasons for their non-renewal of Plaintiff's residency contract.  In the current posture of this litigation, however, the court is precluded from relying on such evidence and must accept the factual allegations in Plaintiff's Amended Complaint.

"resolve all reasonable inferences in plaintiff's favor." *Moya v. Schollenbarger*, 465 F.3d 444, 455 (10th Cir. 2006); *Seamons*, 84 F.3d at 1232.  However, conclusory allegations without supporting factual averments need not be accepted.  *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 510 (10th Cir. 1998); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991);  *Brooks v. Sauceda*, 85 F. Supp.2d 1115, 1123 (D. Kan. 2000), *aff'd*, 242 F.3d 387 (10th Cir. 2000) (legal conclusions, deductions, and opinions couched as facts not presumed true).   In addition, facts established by attachments to the Amended Complaint and admissible for purposes of a motion to dismiss.  *See Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001) ("in deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may look both to the complaint itself and to any documents attached as exhibits to the complaint"); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir.1997) (court may consider documents referenced in the complaint).

## B.  STANDARD FOR QUALIFIED IMMUNITY

At the heart of the Individual Defendants' motion is a request that the court determine that they are entitled to qualified immunity.  In the face of a qualified immunity defense raised in a motion to dismiss, a plaintiff must show that the well pleaded allegations of her complaint, if true, establish a constitutional violation.  *Gomes v. Wood*, 451 F.3d 1122, 1134-1135 (10th Cir. 2006), *cert. denied*, _ U.S. _, (2006);  *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006). If the allegations do not meet that standard, the court must dismiss the claim.  *Gomes*, 451 F.3d at 1134-35.   If the allegations do establish a constitutional violation, it is then the plaintiff's burden to show that there was clearly established law prohibiting the defendants' actions.  *Id.;  Walker*

3

*v. City of Orem*, 451 F.3d 1139, 1151 (10th Cir. 2006).

Qualified immunity is a powerful defense which summarily eliminates many claims like Plaintiff's because the immunity is not a mere defense to liability; rather it is an entitlement not to stand trial or face the other burdens of litigation, and it is effectively lost if a case is erroneously permitted to go to trial.   *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1239 (10th Cir. 2003).   Qualified immunity is an important doctrine serving at least three purposes as identified by the United States Supreme Court.   First, qualified immunity protects the public from unwarranted timidity on the part of public officials.   *Gomes*, 451 F.3d at 1135 (quoting *Richardson v. McKnight,* 521 U.S. 399, 408 (1997)).   Second, the doctrine helps "to ensure that talented candidates are not deterred by the threat of damages suits from entering public service." *Id*. (internal quotation marks omitted).   Third, qualified immunity reduces the chance that lawsuits will distract from the performance of public duties.   The doctrine seeks to balance the protection of constitutional rights and the substantial social costs of imposing liability on public officials. *Id*. (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

## II.   ALLEGATIONS UPON WHICH THE COURT HAS RELIED FOR PURPOSES OF THIS MOTION

Plaintiff Diana Halverson, M.D., completed medical school at the University of Utah in 2005.   In the spring of 2005, she applied for and was accepted into the University's newly created  Emergency Medicine residency program–a program that teaches newly graduated medical students how to be emergency room doctors.   The SOM entered into a Houseofficer Agreement (the "Agreement") with Plaintiff to provide post-graduate medical training in the field of emergency medicine, consistent with the standards of the "Essentials of Approved Residencies

prepared by the Accreditation Council on Graduate Medical Education." The Agreement also required Plaintiff to perform certain medical services on behalf of the SOM for the stipend of $41,925.00 for the first year. The Agreement is specific, stating that it is for a "training program" for the resident. Numerous references are made in the Agreement to the training nature of the program.[2]

Plaintiff alleges that she performed her services under the Agreement in a satisfactory manner and that she received evaluations that met or exceeded expectations. According to Plaintiff, at no time prior to February 22, 2006 did she receive notice of any negative evaluation that would adversely impact her residency, nor was she placed on corrective action or placed on probation for remediation.[3] On February 22, 2006, however, Dr. Hartsell and Dr. Stroud sent to Plaintiff the following letter:[4]

> Diana –
>
> This letter is to inform you that we will not be renewing your University of Utah House Officer Agreement for 2006-2007. Your current House Officer Agreement expires on June 30, 2006. Your employment with the University of

---

[2] *See, e.g.*, Complaint Exhibit A, page 1 stating that the "Houseofficer" is appointed "as a trainee" in "Training Program Emergency Medicine," and "[a] suitable environment will be provided for educational experience and training in the areas of the above-named training program."

[3] Such allegations, however, are contradicted by Exhibit D to Plaintiff's Amended Complaint, and, thus, the court need not accept such conclusory allegations as true. Nevertheless, the court's determinations below are based on an acceptance of Plaintiff's alleged facts, along with the statements in the February 22, 2006 letter. Plaintiff has not denied the veracity of the statements made in the letter, but rather, challenges the motivation behind the decision announced in the letter.

[4] This letter is attached to Plaintiff's Amended Complaint as Exhibit D and therefore may be relied upon in this motion.

Utah School of Medicine will cease on June 20, 2006.  As described in further detail below, as of today, we are placing you on paid administrative leave until June 30, 2006 at which time your contract will end.

Although there are many reasons for this action, the following are some examples of your behavior which have led to our decision:

1.   In November you came very late to our mandatory educational conference. When this issue was addressed with you, you were argumentative, insubordinate, and unwilling to take personal responsibility for your actions.  Your behavior in dealing with this matter was extremely unprofessional.

2.   In December during your ICU rotation your behavior was so difficult for the residents on the service with you that they felt the need to notify the chief resident and the internal medicine program director of their negative experiences.  Both the residents themselves and their program director commented on your failure to have adequate interpersonal communication and professionalism skills.  When we discussed these issues with you, you were again argumentative and unwilling to accept personal responsibility for your behavior.  The perception of our program by other programs in the hospital was damaged both by your behavior on this rotation, and your behavior in dealing with the situation afterward.

3.   During your semi-annual performance evaluation you were again insubordinate and displayed a great deal of open disrespect for your program director and for your program.  You were very argumentative, and at one point you verbally threatened your program director.  You continued to deny personal responsibility for any of your actions, even your grossly inappropriate behavior during that meeting.  Your actions and attitude displayed an extreme lack of professionalism.

4.   You have repeatedly stated to both of us that you are very dissatisfied with us as program directors, and that you have grave concerns about our ability to lead the program.  You have also stated on numerous occasions that your are concerned that the program will fail under our leadership.   We feel that this continued voicing of your lack of confidence in us, as well as many other actions on your part, has permanently damaged our ability to effectively continue your training in our program.

5.   You failed to take the ABEM in-training examination today.  This is a requirement of all residents in our program.  This was also a mandatory

attendance day for our educational conference, and you did not receive an excused absence from either the test or the educational conference.  Once again, your actions have demonstrated an inexcusable lack of both professionalism and interpersonal communication skills.

6.      In a January 19, 2006 email to Dr. Stroud, you resigned from the program and stated that you would "do your best to fulfill [your] obligations until the end of June."  We discussed this resignation with you and gave you until February 15, 2006 to withdraw your resignation.  You never contacted us to withdraw your resignation nor have you indicated any future willingness or interest in participating in this residency program.  It is important to us to have residents in the program who actually want to be in the program and whom we can rely on to have regular and predictable attendance at educational and clinical functions.  Your apparent ongoing desire to resign from the program casts serious doubt on your predictability and reliability.

As of today, we are placing you on paid administrative leave until June 30, 2006 at which time your contract will end.  You will receive your regular salary and benefits while you are on leave.  You will not be allowed to perform any clinical duties or attend any educational events associated with our residency program or the University of Utah School of Medicine during your administrative leave.  You should not initiate contact with any of the patients, residents, faculty, or staff associated with the residency program except Stephen Hartsell or Susan Stroud.  We do not want you to come to our administrative offices unless you are specifically invited to do so at an agreed upon time by Stephen Hartsell or Susan Stroud.

You should contact Stephen or Susan in order to arrange the return of any personal effects remaining at any of the hospitals associated with our residency program.  We expect you to return all items noted on the checkout procedure list accompanying this letter to Judi Short in the GME office by March 1, 2006.

If you disagree wi this decision, you may file a grievance by contacting Judi Short in the GME office at 581-2401 by 5:00 p.m. on March 6, 2006.  If you do not initiate the grievance process by this specified deadline, you will be deemed to have waived your right to file a grievance.

The letter was signed by Stephen Hartsell, M.D., Program Director, University of Utah

Affiliated Residency in Emergency Medicine and Susan Stroud, M.D., Associate Program

Director, University of Utah Affiliated Residency in Emergency Medicine.

Plaintiff contends that at no time prior to this letter was she provided with any form of notice or hearing before terminating her residency.   Plaintiff believes that Dr. Hartsell, Dr. Stroud, Dr. Allen, Ms. Short, and Mr. Smith were motivated to summarily terminate her residency because she exercised her right to speech under the First Amendment to the United States  Constitution.

Specifically, she claims that she voiced concerns about the SOM Emergency Medicine Department's compliance with the ACGME Common Duty Hour Standards.   Plaintiff refused to sign a verification that the SOM was in compliance with the ACGME standards.  She also voiced concerns about a nurse dispensing medicine without authority and using equipment that was not properly sterilized.   She also asserts that she voiced concerns about the newly created Emergency Residency Program itself, along with the leadership of the Department.

In addition, Plaintiff alleges that Dr. Hartsell, Dr. Stroud, Dr. Allen, Ms. Short, and Mr. Smith were angry and retaliated against her for exercising her right to obtain a copy of allegedly defamatory emails originating from two MICU residents within the MICU Department at the end of Plaintiff's rotation in December.   Plaintiff claims that these emails were previously withheld by Defendants but were being used by them to personally criticize Plaintiff.

On March 6, 2006, Plaintiff filed an appeal of her termination pursuant to the Defendants' Due Process Policy.   Plaintiff, however, believed that the Defendants' Due Process Policy failed to comply with the Utah and United States Constitutions and due process of law in that, among other things:

1.     The policy did not afford a grievant the right to a prompt, full-blown adversarial hearing;

2.      The policy did not afford a grievant the right to an impartial fact-finder;

3.      The policy prohibited the right of a grievant to confront and cross-examine

witnesses;

4.      The policy did not afford a grievant the right to have witnesses testify under oath;

5.      The policy prohibited the right of a grievant to effective legal counsel;

6.      The policy failed to provide for appropriate findings of fact and conclusions of

law;

7.      The policy did not afford a grievant the right to subpoena witnesses; and

8.      The policy did not afford a grievant the right to an adequate record of proceedings.

Accordingly, Plaintiff filed the instant lawsuit on March 17, 2006.  On March 20, 2006, she filed a Motion for a Temporary Restraining Order.  On the same date, the court temporarily denied Plaintiff's request for immediate reinstatement into the residency program, but it granted a Temporary Restraining Order, enjoining Defendants from proceeding with the grievance process pending the receipt of a response memorandum from Defendants.  The court stated in the March 20, 2006 Order that after receiving Defendants' response memorandum, the court would then "take under advisement all other aspects of Plaintiff's Motion for a Temporary Restraining Order, including whether or not to continue this Provisional Temporary Restraining Order, for further ruling."

Three days later, on March 23, 2006, and prior to any further hearings before the court, Defendants unilaterally offered to reinstate Plaintiff into her residency program, effective April 1, 2006, and place her under a Corrective Action Plan.   In addition, Defendants stated in their March 23, 2006 letter to Plaintiff's counsel that it would modify their existing grievance policies

to provide additional rights to Plaintiff, such as allowing her counsel to actively participate in the hearing process, permitting the hearing to be tape recorded, providing to Plaintiff's counsel a copy of the tape, issuing a written report, permitting plaintiff's counsel to call and examine witnesses, requiring each witness to swear to tell the truth, and that the hearing committee would consist of an equal number of residents and faculty, with none of the residences being from the program.

Plaintiff claims that Defendants–and Defendant Smith in particular–were obligated to insure in good faith that Plaintiff was provided the rights identified above.  After having received the March 23, 2006 letter, Plaintiff withdrew her Motion for a Temporary Restraining Order and filed a second grievance over being placed on the Corrective Action Plan.

Plaintiff's first rotation back following April 1, 2006 was at the LDS Hospital Emergency Department under the direction of Dr. Allen.  Plaintiff claims, however, that beginning on or about April 2, 2006, Dr. Allen and other conspirators commenced a systematic process of poisoning the possibility of succeeding in her rotation and under her Corrective Action Plan. For example, Plaintiff claims that:

1.   Dr. Allen either solicited, encouraged, or allowed a resident of the Emergency Program to obtain a "letter of support" of all emergency medicine residents for Defendants Hartsell and Stroud, thereby poisoning Plaintiff's opportunity of having successful professional relationships with her fellow residents.

2.   Dr. Allen advised the LDS Hospital Emergency Medicine Faculty and Staff that Plaintiff had legal issues with her residency rotation thereby undermining their willingness to actively instruct and train Plaintiff in the rotation.

3.      Dr. Allen solicited "spies" to provide him with information regarding Plaintiff regarding each and every event involving Plaintiff.

4.      After the hearing of the Program Grievance Committee, wherein Dr. Allen testified as a witness, he emailed and advised the faculty at LDS Hospital, individuals who would be providing evaluations regarding Plaintiff during her rotation there, that ". . . .  This continues to be quite depressing and sad. . . .  In my opinion, there is ample justification for both the corrective action letter and the non-renewal of contract.  I will review my reasoning and evidence if you desire . . . .  I continue to thank you for your efforts and teaching and hope that this will not unduly damage the progress we are making as educators and clinicians."

5.      Thereafter, Dr. Allen and other conspirators systematically encouraged selected evaluators to file their rotation evaluations on time and in a specific manner that were unfavorable to Plaintiff, while not doing the same to those favorable to Plaintiff, in an effort to justify the actions taken against her on February 22, 2006 and placing her on a Corrective Action Plan.

On April 26, 2006, a hearing was held before the Program Grievance Committee regarding the termination of the Plaintiff's residency and her having been placed on a Corrective Action Plan.  Plaintiff claims that despite the fact that Mr. Smith was personally present and personally had an obligation to safeguard the rights to due process promised to Plaintiff, she was not afforded all of the federally protected rights to due process identified above.  On or about May 9, 2006, the Program Grievance Committee upheld Plaintiff's suspension of residency and employment that occurred on February 22, 2006.   On or about June 16, 2006, the Housestaff

11

Grievance Committee upheld the decision of the Program Grievance Committee.  On or about

June 23, 2006, Defendant Bjorkman upheld the decision of the Program Grievance Committee.

On or about July 10, 2006, Defendant Betz upheld the decision.

As a result of Defendants' alleged wrongful conduct, Plaintiff asserts that her residency

was interrupted for a period of February 22, 2006 through April 2, 2006, and then was terminated

effective June 30, 2006.   When her contract was not renewed, Plaintiff sought to transfer to

another emergency medicine residency program for the 2006-2007 residency year.  To transfer,

Plaintiff needed a credentials letter to be prepared by Defendants in accordance with the policies

and procedures of the ACGME.

On or about May 1, 2006, Plaintiff's counsel advised Mr. Smith that Plaintiff had learned

of an opening at the University of Oregon, and that the Residency Director there, Dr. Brunett,

was interested in placing Plaintiff in the program but needed the credentials letter and also

wanted to speak to Drs. Hartsell and Stroud.

According to Plaintiff, Mr. Smith declined to allow Dr. Brunett to speak to Drs. Hartsell

and Stroud and declined to have a credentials letter written, unless Plaintiff signed a complete

waiver of liability.   Plaintiff claims that nothing in the ACGME policies and procedures permits

an institution to demand a waiver before issuing a credentials letter.

On or about May 24, 2006, Plaintiff's counsel advised Mr. Smith that the Defendants

were violating ACGME policies by withholding a credentials letter.   Plaintiff contends that only

after a Complaint was formally filed with the ACGME did the Defendants provide an appropriate

credentials letter.   She claims, however, that the delay in providing the letter prevented her from

being able to interview or to be considered for the University of Oregon position for the 2006-

12

2007 program year.   Plaintiff alleges that as a result of Defendants' wrongful conduct, her ability to complete her residency was adversely impacted.   Moreover, she claims, by terminating her residency program and failing to provide a credentials letter, she was not able to transfer to another program for the 2006-2007 year and that she would be required to reapply for another residency program for the 2007-2008 program as a first-year resident.

## III.  DISCUSSION

### A.  MEDICAL SCHOOL'S MOTION TO DISMISS

The University claims that, as an arm of the state, it is immune from being sued in federal court pursuant to the Eleventh Amendment to the United States Constitution.  Plaintiff, on the other hand, argues that the State System of Higher Education Act specifically states that "[t]hese institutions [including the University of Utah] are empowered to sue and be sued and to contract and be contracted with."   Accordingly, Plaintiff argues, the Utah legislature has waived the University's immunity because the Act states that the University may be sued without qualification.

The court finds no merit to Plaintiff's argument.  "The Tenth Circuit has repeatedly demonstrated 'a preference for an approach giving full effect to the Eleventh Amendment *absent some extraordinarily effective waiver.*'"  *University of Utah v. Shurtleff,* 252 F. Supp. 2d 1264, 1283 (D. Utah 2003) (quoting *Richins v. Industrial Constr., Inc.*, 502 F.2d 1051, 1055-56 (10th Cir. 1974) (emphasis in original)).  A state may waive its Eleventh Amendment immunity only where stated by the most express language or by such overwhelming implication from the text of a state statutory or constitutional provision as will leave no room for any other reasonable construction. *V-1 Oil Co. v. Utah State Dept. of Public Safety*, 131 F.3d 1415, 1421 (10th Cir.

1997).

The Utah legislature has not expressly and unequivocally waived the University's

immunity from suit in federal court, and the state of Utah has not in any other way consented to

this lawsuit.    The Tenth Circuit has specifically found that the "University of Utah Medical

Center, as a part of the University of Utah, is an arm of the state entitled to Eleventh Amendment

immunity."   *See Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 575-77;  *Roach v.*

*University of Utah*, 968 F. Supp. 1446, 1451 (D. Utah 1997).    The Supreme Court has

consistently held that pursuant to the Eleventh Amendment, an unconsenting state is immune

from suits brought in federal courts by its own citizens as well as by citizens of another state.

*Edelman v. Jordan*, 415 U.S. 651, 662-663 (1974); *see Pennhurst State Sch. & Hosp. v.*

*Halderman*, 465 U.S. 89, 100 (1984).   Accordingly, Plaintiff's claims against the University are

dismissed without prejudice.[5]

**B.  DEFENDANTS' MOTION TO DISMISS**

In their motion, The SOM and the Individual Defendants seek dismissal of many causes

of action.[6]   First, they argue, the University and its employees in their official capacities are not

amenable to suit under 42 U.S.C. § 1983 because they are not "persons" who can be sued.

Second, to the extent Plaintiff seeks to hold University employees liable in their individual

---

[5]  As noted below, however, Plaintiffs' civil rights claims against the SOM are dismissed with prejudice because the SOM is not a "person" amenable to suit under 42 U.S.C. § 1983.

[6]  Plaintiff has conceded that her Seventh and Eighth Causes of Action (Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing) should be dismissed on the ground that the Individual Defendants did not enter into a contract with Plaintiff; rather, the University was the contracting party.  Because the University has been dismissed as a defendant, Plaintiff's Seventh and Eighth Causes of Action are dismissed in their entirety.

capacities, Defendants argue that the allegations of her Amended Complaint fail to show constitutional violations.  According to Defendants, Plaintiff's allegations allege many misdeeds but, even assuming they are true, they are not constitutional misdeeds.   Third, to the extent Plaintiff has alleged a constitutional violation, there was no clearly established law putting the Individual Defendants on notice that their actions were constitutional violations.  Each of these arguments will be addressed in turn.

### 1.  Claims Against the University and the Individuals in Their Official Capacities

Plaintiff's First, Second, Third, Fourth, and Fifth Causes of Action seek to hold the University and various employees of the University sued in their official capacities, liable for various alleged constitutional violations pursuant to 42 U.S.C. § 1983.   The University and its employees in their official capacities are not "persons" who can be sued under § 1983. *Roach*, 968 F. Supp. at 1451 ("To the extent that plaintiff's § 1983 claims are asserted against the University, they are dismissed; the University is an arm of the state and is therefore not a "person" within the meaning of § 1983"); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983"); *Harris v. Champion*, 51 F.3d 901, 905-06 (10th Cir. 1995) ("To the extent plaintiffs sought relief against the Oklahoma Court of Criminal Appeals itself, the district court properly dismissed plaintiffs' civil rights claims. Neither the state, nor a governmental entity that is an arm of the state for Eleventh Amendment purposes, nor a state official who acts in his or her official capacity, is a 'person' within the meaning of § 1983.").

Thus, the University and Defendants Dr. Hartsell, Dr. Stroud, Dr. Allen, Mr. Young, Dr. Betz and Dr. Bjorkman, Ms. Short, and Mr. Smith, insofar as they are sued in their official

capacities, are dismissed from all claims in this lawsuit, with the exception of the Tenth Claim

for Relief to the extent Plaintiff seeks prospective injunctive relief through that claim.

### 2.     Claims Against the Individual Medical School Defendants in Their Individual Capacities

Next, several of the Individual Defendants are sued in their individual capacities,

including Dr. Hartsell (Program Director of the Affiliated Residency in Emergency Medicine),

Dr. Stroud (Associate Program Director of the Affiliated Residency in Emergency Medicine), Dr.

Allen (Assistant Program Director of the Affiliated Residency in Emergency Medicine), Ms.

Short (Director of the Graduate Medication Education), and Mr. Smith (general counsel for the

University of Utah).[7]   These Individual Defendants seek dismissal of Plaintiffs' First, Third,

Fourth, Fifth, and part of the Sixth Causes of Action on the ground of qualified immunity.

Specifically, they argue that Plaintiff has failed to plead a valid constitutional violation, and,

furthermore, even if she had pled a constitutional violation, there is no clearly established law

that would have given Defendants notice that they were violating Plaintiff's rights.

Consequently, they seek dismissal of these claims against them in their individual capacities.

### a.  First Cause of Action–Deprivation of Procedural and Substantive Due Process

Plaintiff claims that she had a reasonable expectation of continuing in and completing her

residency program at the SOM.  She argues that the summary suspension of her employment and

the termination of her residency program–without a pre-termination hearing–violated her right to

procedural due process of law under the United States Constitution.  Plaintiff also asserts that her

due process rights were further violated by Defendants' failure to provide her with a full and fair

---

[7] Mr. Smith, through separate counsel, has joined in the motion filed by the other Individual Defendants.

post-termination hearing.  Finally, she contends that the decision of the Program Grievance

Committee and the other decisions on appeal, violated her right to procedural and substantive

due process and were arbitrary and capricious.

### I. Procedural Due Process

Defendants argue that Dr. Halverson's procedural due process claim fails because (1) she

has no property interest in a three-year residency program, (2) she suffered no property loss

because she was paid while suspended and then resumed her residency, and (3) she has failed to

allege facts supporting the conclusion that the procedures provided to her were not in accord with

due process.   In so arguing, Defendants contend that only lesser due process procedures must be

given to medical residents–not the level of due process that is required to be given to employees.

Even accepting Plaintiff's allegations, however, Defendants contend that the process given was

more than the process required under the Constitution.   In addition, Defendants argue that even

if Plaintiff has stated a due process violation, there is no clearly established law that the process

she was given was deficient for a medical resident.   With regard to Plaintiff's substantive due

process claim, Defendants argue that such a claim fails because Plaintiff has failed to allege facts

sufficient to support a claim that the decision not to renew her Agreement was "beyond the pale

of reasoned academic decision making."  *See Regents of the University of Michigan v. Ewing*,

474 U.S. 214, 227 (1985).

The Due Process Clause "provides that certain substantive rights–life, liberty, and

property–cannot be deprived except pursuant to constitutionally adequate procedures."

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985); *Board of Regents v. Roth*, 408

U.S. 564 (1972).  "An essential principle of due process is that a deprivation of life, liberty, or

property be preceded by notice and opportunity for hearing appropriate to the nature of the case."
*Loudermill*, 470 U.S. at 542.  The Tenth Circuit has stated that "[t]o determine whether a
plaintiff was denied procedural due process, we engage in a two-step inquiry: (1) Did the
individual possess a protected interest to which due process protection was applicable?  (2) Was
the individual afforded an appropriate level of process?"  *Schulz v. City of Longmont, Colorado*,
465 F.3d 433, 443 (10th Cir. 2006).

     To have a property interest, a person clearly must have more than an abstract
need or desire and more than a unilateral expectation of it.  *Id*.  A person must, instead, have a
legitimate claim of entitlement to it, and such entitlements are not created by the Constitution.
Rather, they are created and their dimensions are defined by existing rules or understandings that
stem from an independent source such as state law.  *Id*.

     Plaintiff had no legitimate claim of entitlement to more than one year in the residency
program.[8] Plaintiff signed the Agreement ,which set out the terms of her program.  *See*
"University of Utah School of Medicine Houseofficer Agreement 2005-2006" attached as
Exhibit A to Plaintiff's Amended Complaint and incorporated by reference therein.   The
Agreement specifically states that it was limited to a term of one year.   *See* Exhibit A, page 1
stating the agreement "is entered into for one year beginning June 24, 2005 and ending June 30,
2006."   The Agreement reiterates and expands on this limitation on page 4:

    7. Terms and termination:
    (a)    The term of this agreement is for one year unless expressly provided
          otherwise therein.
    (b)    This agreement does not establish any right or expectancy of an appointment
          for any subsequent residency year regardless of the number of years generally

---

    [8]  Dr. Halverson alleges that she had a property interest in a three-year program, but such
an assertion is a legal conclusion that is not presumed to be true.

associated with a particular training program.

©      Any agreements or representations to the contrary are not valid unless reduced in writing and incorporated as a specific amendment to this agreement.[9]

Therefore, based on the facts alleged in the Amended Complaint, Plaintiff has not pled a procedural due process violation with regard to the Defendants' refusal to extend her residency beyond the first year because she had no property interest in a three-year residency program.

Moreover, even if a property interest existed in a three-year residency program, Plaintiff has failed to point to any clearly established law on the subject. Rather, the small amount of authority that exists on this point suggests the contrary. *See*, *e.g.*, *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86-90 (1978) (finding that the due process clause does not require that a student dismissed from a state medical school for academic reasons be given a hearing); *Trotter v. Regents of the University of New Mexico*, 219 F.3d 1179, 1184 (10th Cir. 2000) ("Trotter in her written briefs and at oral argument failed to identify any clearly established law supporting her claim that she held a "property" or "liberty" interest in continued enrollment at the Medical School despite her academic failures.").

Although Plaintiff claims that the law is clearly established that Plaintiff had a property interest in a three-year residency, her cited cases do not stand for such a proposition. For example, in *Harris v. Blake*, 798 F.2d 419 (10th Cir. 1986), the Tenth Circuit Court of Appeals

---

[9] Further bolstering this conclusion is the language of the Housestaff Policies and Procedures Resident Evaluation Policy, attached as Exhibit B to Plaintiff's Amended Complaint. This document states under the heading "Renewal of Houseofficer Agreements:"

Residents performing satisfactorily may have the resident agreement renewed for the subsequent year. The resident agreement is renewable annually as agreed among the resident, the program director, and the School of Medicine. Issuance of an agreement for one year does not imply the resident will complete the training program. Agreements for succeeding years of training will be issued only after specified conditions have been met.

determined that the plaintiff had a property interest in his master's degree program.  But the court pointed out that "[t]he actual payment of tuition secures an individual's claim of entitlement." *Id*. at 422.   In this case, Dr. Halverson was not paying tuition; rather, she was being paid a stipend for her training. [10]  Similarly, in *Roach v. University of Utah*, 968 F. Supp. 1446 (D. Utah 1997), the plaintiff was also a tuition-paying graduate student.   There is no Supreme Court or Tenth Circuit law clearly establishing that a medical resident has a property interest in a three-year residency program.   Therefore, the Individual Defendants are entitle to qualified immunity on Plaintiff's procedural due process claim pertaining to the non-renewal of her contract.

Even if there were a property interest in a three-year residency program, Plaintiff's allegations establish that she received all the process to which she was entitled.  Among courts that have assumed that a property or liberty interest existed for graduate students, "[c]ourts overwhelmingly agree that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs." *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir. 1989); *see also Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775 (2nd Cir. 1991) (comparing a medical resident to a student and applying the due process standard given to students who had been disciplined–notice and an opportunity to be heard); *Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir.), *rehearing and rehearing en banc denied*, 2005 U.S. App. LEXIS 6175 (7th Cir. April 6, 2005) (treating medical resident as a student in deciding that he was dismissed for academic reasons for lying on his application form).

---

[10]  The Tenth Circuit more recently noted in *Trotter* that the plaintiff "must demonstrate that her dismissal from the Medical School deprived her of either a 'liberty' or 'property' interest created by . . .state law" and that she had failed to do so.  *Id.* at 1184.  Even in *Trotter*, the plaintiff was a tuition-paying medical student and not a medical resident, as in the instant case.

For purposes of due process, it is clear that medical residents, like other medical students, are not considered to be employees and are entitled only to lesser due process procedures than employees. *See Trotter*, 219 F.3d at 1185 (medical student not entitled to a hearing when dismissed for academic reasons). In *Davis*, the Fifth Circuit Court of Appeals held that a dental resident, even though paid for work during his residency, was a student for purposes of due process and minimal due process procedures applied:

> It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program. ... The same factors that justified minimal procedural protections in the *Horowitz* medical school context apply with equal force to the paid residency situation. ... For the foregoing reasons, we decline to apply the full procedural protections of the Fourteenth Amendment to Davis' academic dismissal.

*Id*. at 974. The *Davis* court reasoned that "[s]uccessful completion of the residency program depends upon subjective evaluations by trained faculty members into areas of expertise that courts are poorly equipped to undertake in the first instance or to review. A school is an academic institution not a courtroom or administrative hearing room, and thus it should not be weighted down with formalized procedural requirements imposed by actors estranged from the academic environment." *Id.* (internal citations and quotation omitted). The Fifth Circuit applied this reasoning to medical residents in a subsequent case. *See Shaboon v. Duncan*, 252 F.3d 722, 732 (5th Cir. 2001) ("*Davis [v. Mann]* established that medical residents are not employees protected by the due process clause"). *See also Hernandez v. Overlook Hospital*, 692 A.2d 971 (N.J. 1997); *Allahverdi v. Regents of the Univ. Of New Mexico*, 2006 WL 1313807 (D.N.M. April 25, 2006).

In addition, not only are students afforded less procedural due process than employees,

but also, the Supreme Court has emphasized that even less stringent procedural requirements

attach when a school makes an academic judgment about a student than when it takes

disciplinary action.  *See Harris v. Blake*, 798 F.2d 419, 423 (10th Cir. 1986).   In making an

academic judgment, the court has held that notice, followed by a careful and deliberate

determination, satisfied the requirements of due process.  *Id.*

        In the instant case, the decision affecting Dr. Halverson was academic rather than

disciplinary.  *See Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001).   In *Shaboon*, court

reasoned that the plaintiff medical resident's dismissal was academic if it "rested on the

academic judgment of school officials that she did not have the necessary clinical ability to

perform adequately as a medical doctor and was making insufficient progress toward that goal."

*Id.* (quoting *Horowitz*, 435 U.S. at 89-90) (finding that person hygiene and timeliness might be

important factors in a school's determination of whether a student will make a good medical

doctor).   The *Shaboon* court then found that the plaintiff's refusal to acknowledge and deal with

her problems furnished a sound academic basis for her dismissal .  *Id.*

        Similarly, in this case, the letter sent to Dr. Halverson on February 22, 2006, recounts Dr.

Halverson's failure to attend a mandatory educational conference, her failure to take the ABEM

in-training examination, the difficulty other residents had had working with her, her inadequate

interpersonal communication skills, her lack of professionalism, and the lack of reliability and

predictable attendance.   The court finds that the non-renewal of Plaintiff's residency Agreement

was due to academic reasons.  Moreover, as demonstrated by Exhibit D to Plaintiff's Amended

Complaint (and not contradicted by Plaintiff), Plaintiff had actually sent an email resigning from

the program as of June 30, 2006.   She was told that Drs. Hartsell and Stroud did not accept her

resignation–and they asked her to reconsider.  Even after having been given a chance to rescind

her resignation, Plaintiff failed to do so.  Defendants, then, were under some obligation to make

it clear to Plaintiff that the Agreement would not be renewed because the Resident Evaluation

Policy provides that "[a]ny decision not to renew shall be made and communicated in writing to

the houseofficer no later than four months prior to the end of the agreement year [June 30], when

possible."   Thus, the four-month deadline was just days away.   Because of these extraordinary

circumstances, the court finds that even under Plaintiff's alleged facts, she received notice,

followed by a careful and deliberate determination.[11]  Because only lesser due process procedures

must be given to medical residents, Plaintiff has failed to state a constitutional due process

violation.

In her First Cause of Action, Plaintiff appears to seek employee-type due process

protections.  Such protections simply do not apply in this case.   To establish a constitutional

procedural due process violation, she must show that she did not receive the protections

applicable to a student and she has failed to do this.  At most, assuming she had a property

interest in a three-year residency, Plaintiff was entitled to "some meaningful notice and an

opportunity to respond." *Davis*, 882 F.2d at 975.   In fact, the Amended Complaint affirmatively

demonstrates that she received more than minimal due process protections.   Plaintiff alleges  that

she was offered the opportunity to appeal her suspension and dismissal pursuant to the

University's Due Process Policy. Amended Complaint, ¶ 29 and Exhibit D (dismissal letter

which stated that "If you disagree with this decision, you may file a grievance...").  The Due

Process Policy allowed review by a grievance committee of residents and faculty.   Exhibit C,

---

[11]   Even if not Plaintiff's residency was not renewed based on disciplinary–rather than
academic–reasons, the court finds that she still received all process to which she was entitled.

page 3.   Plaintiff would have been allowed to appear before the grievance committee with an

advocate.  *Id*.  The decision of the grievance committee could be appealed further.  *Id*.

Ultimately, Plaintiff was reinstated into the academic program before the grievance process took

place.   Amended Complaint  ¶ 33.  Eventually, Plaintiff did appeal the decision to not renew her

for a second year of residency and was given even more rights than the University's Due Process

Policy provided.   Amended Complaint  ¶¶ 36, 39.  Thus, the First Cause of Action is dismissed

for failing to state a constitutional violation with regard to the due process procedures offered.

Again, even if she had stated a claim for inadequate due process for students, the

Individual Defendants are entitled to qualified immunity because Plaintiff has failed to show any

clearly established law that the due process available under the University's policies or the

greater process she actually received was deficient.   Thus, there is no clearly established law that

would put a reasonably person on notice that their actions violated the constitution.

With respect to Plaintiff's claim for a procedural due process violation with respect to the

interruption of her first year of residency, she has failed to state a claim.  Ultimately, the

suspension did not cause Plaintiff to lose any salary or benefits because she was paid during the

six weeks she was suspended.   The suspension did not set back her education because she would

have received a full year's credit had she finished out the remainder of the year.   Thus, no

constitutional due process violation is stated with regard to the suspension.

Plaintiff also claims that she suffered a violation of her procedural due process rights

when the University violated its own policies and procedures.   This allegation fails to state a due

process violation because a University's violation of its own policies or procedures is not enough

to make out a constitutional claim.  "[E]ven assuming that the Medical School failed to follow its

own regulations, we find that this failure would not, by itself, give rise to a constitutional claim under the Fourteenth Amendment." *Trotter*, 219 F.3d at 1185; *Horowitz*, 435 U.S. at 92 n.8 (suggesting that a university's failure to follow its own academic rules does not, in itself, give rise to a due process violation).

ii. <u>Substantive Due Process Claim</u>

In addition to a procedural due process claim, Plaintiff has alleged a substantive due process violation in her First Cause of Action.[12]   While procedural due process "ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision; substantive due process, on the other hand, guarantees that the state will not deprive a person of those rights for an arbitrary reason regardless of how fair the procedures are that are used in making the decision." *Archuleta v. Colorado Dep't of Insts., Div of Youth Servs.*, 936 F.2d 483, 490 (10th Cir. 1991).   Substantive due process claims "are not based on state law but are founded upon 'deeply rooted notions of fundamental personal interests derived from the Constitution.'" *Hennigh v. City of Shawnee*, 155 F.3d 1249 (10th Cir. 1998) (quoting *Mangels v. Pena*, 789 F.2d 836, 838 (10th Cir. 1986)).

Assuming, *arguendo*, that Plaintiff had a fundamental property interest in her residency, Plaintiff has failed to allege facts sufficient to support a substantive due process violation.   Even if Plaintiff's version of the facts is accepted as true, she has done nothing to allege that the February 22, 2006 letter contains false statements.   Consequently, the alleged facts in the Amended Complaint are that ultimately Plaintiff was not continued in the Emergency Medicine residency program because the program was dissatisfied with her.   Plaintiff makes no showing

---

[12]   Plaintiff's allegation that the decision and appeals decisions were arbitrary and capricious is merely a legal conclusion, which the court need not accept as true.

that this decision was "beyond the pale of reasoned academic decision making." *See Hennessy v. City of Melrose*, 194 F.3d 237, 252 (1st Cir. 1999); *see Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 227 (1985); *Whiting v. University of Southern Mississippi*, 451 F.3d 339 (5th Cir. 2006).

Finally, even if she had alleged facts amounting to a substantive due process violation, she has failed to set forth any clearly established law. The Individual Defendants, therefore, are protected by qualified immunity regarding Plaintiff's substantive due process claim.

    b.    *Third Cause of Action–Deprivation of Equal Rights and Due Process-Corrective Action Plan*

Plaintiff's Third Cause of Action alleges that she was deprived of equal rights and procedural due process with regard to the reinstatement under a corrective action plan. This claim pertains to the Defendants' agreement to reinstate Plaintiff effective April 1, 2006 and to allow her to finish her first year of residency and transfer to a different residency program under a Corrective Action Plan. Plaintiff claims that implicit with this commitment was an obligation of good faith and fair dealing without any further deprivations of due process. Yet, according to Plaintiff, Defendants' intentional and purposeful refusal to honor in good faith their commitment to reinstate her for the balance of her first year and allow her to transfer, violated her right to equal protection of the law and due process of law, depriving her of her property and liberty interests, and that their actions were arbitrary and capricious.

    I.  Equal Rights

The equal rights portion of this Cause of Action is dismissed because Plaintiff has failed to state such a claim. There are no allegations in the Amended Complaint regarding how she was treated differently from others who were similarly situated. *See Hennigh*, 155 F.3d at 1257. In

addition, she has failed to link the alleged deprivations to the person who allegedly caused the

deprivation.   Finally, Plaintiff has failed to show any clearly established law on this point, thus

entitling the Individual Defendants to qualified immunity.

ii.  Due Process - Corrective Action Plan

In her Third Cause of Action, Plaintiff also makes a number of allegations about the

Defendants' breach of a duty of good faith and fair dealing, their failure to allow her to transfer,

and their causing her severe emotional distress.   These allegations fail to state a due process

violation regarding her Corrective Action Plan for reasons discussed above–she has not clearly

established that she had a property interest in her residency program, and even if she did, Plaintiff

was entitled to only very minimal procedural due process.  Further, Plaintiff received all the

process to which she was entitled.   Because Plaintiff has failed to allege a constitutional

violation and has also failed to set forth any clearly established law on this point, the Individual

Defendants are entitled to qualified immunity.

*c. Fourth Cause of Action–Conspiracy to Deprive Federal Constitutional Rights*

Plaintiff's Fourth Cause of Action, alleges that Dr. Hartsell, Dr. Stroud, Dr. Allen, Mr.

Smith, and Ms. Short intentionally and purposefully engaged in a conspiracy prohibited under

Section 1983.  She claims that on or about February 10, 2006 and continuing thereafter, the

conspirator defendants attempted to force Plaintiff's resignation from the residency program

solely to prevent her from having access to due process and/or the grievance policies provided by

the University.  In addition, she claims that they intentionally delayed her access to Human

Resources available to her and engaged in a ruse designed to make the Plaintiff believe that Dr.

Allen was a mediator who would reconcile the Plaintiff back into her residency program.

27

Finally, she claims that these defendants conspired to prevent her from being successful under the Corrective Action Plan and from transferring to another residency program.

This Cause of Action fails to state a claim because no constitutional violation is pled. Plaintiff alleges that the Individual Defendants conspired to attempt to force the Plaintiff's resignation from the residency program to prevent her from having access to due process and/or the grievance policies provided by the University.   Amended Complaint, ¶ 86.  The alleged conspiracy was unsuccessful because ultimately Plaintiff alleges she did not resign due to this pressure, she was terminated and was offered hearings and access to the grievance policies provided by the University.   Amended Complaint, ¶¶ 25, 29, Exhibit D.  Because there was no actual deprivation of rights, this fails to state a claim for relief. *Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1449 (10th Cir.1990) (to recover under a § 1983 conspiracy claim, a plaintiff must prove (1) a conspiracy and (2) an actual deprivation of rights).

Plaintiff further alleges that the Individual Defendants delayed Plaintiff's access to Human Resources available to her at the University and engaged in a ruse designed to make the plaintiff believe that Dr. Allen was a mediator who would reconcile plaintiff back into her residency program.  Amended Complaint, ¶ 87.   These allegations fail to state a claim because they do not allege a constitutional violation.   While the alleged actions, if true, might not have been nice, they did not violate some constitutional right.  Plaintiff further alleges that the individual defendants conspired to prevent the plaintiff from being successful under the Corrective Action Plan and from transferring to another residency program. Amended Complaint, ¶ 88.  Again, this fails to allege a constitutional violation.  Without a constitutional violation, there can be no conspiracy to deprive Plaintiff of her rights.

28

*d. Fifth Cause of Action–Deprivation of Liberty Interest (in maintaining her good name and reputation)*

In her Fifth Cause of Action, Plaintiff claims that the Individual Defendants intentionally or recklessly deprived her of her liberty interest in maintaining her good name and reputation by, among other things, suspending and termination her residency; being required by the SOM's own policies to report Plaintiff to the Division of Occupation Licensing and other entities as a result of the suspension and termination, thereby jeopardizing her status as a professional medical provider; causing on or about September 6, 2006 to be published a false and stigmatizing statement to the ACGME that Plaintiff was dishonest; and that on or about April 26, 2006, Dr. Allen caused to be published a false and stigmatizing statement to physicians and others at the LDS Hospital that there was justification for both the corrective action plan and non-renewal of the Plaintiff's residency and implying that the circumstances surrounding Plaintiff's residency were "depressing and sad."

Defendants argue that Plaintiff has failed to allege the elements of a deprivation of a liberty interest and there is no clearly established law that there is even a liberty interest in a medical residency. The court finds agrees with Defendants that Plaintiff has failed to demonstrate that there is clearly established law that a liberty interest exists in a medical residency, and thus the Defendants are entitled to qualified immunity.

Further, the allegations in Plaintiff's Amended Complaint fail to plead a violation of a liberty interest by any defendant. To establish a violation of a liberty interest, four elements need to be shown–(1) that the defendant made a statement impugning the plaintiff's good name, reputation, honor, or integrity; (2) that the statements were false; (3) that the defendant made the statements in the course of termination proceedings or that the statements foreclosed other

employment opportunities; and (4) that the statements were published.  *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994).

With regard to Drs. Hartsell and Stroud and Ms. Short, no allegations are made that they did any of these things.   Plaintiff makes general allegations about the "Defendants" but does not link any Individual Defendant to any of the above elements.  If Plaintiff were to tie her general allegations more specifically to the individual defendants, her general allegations would still fail to state a claim.  The suspension and termination of Plaintiff's residency by itself fails to state a claim.  *See Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1235 (10th Cir. 1998); *Dickeson v. Quarberg*, 844 F.2d 1435, 1440 (10th Cir. 1988).   Also, reporting the suspension and nonrenewal of Plaintiff to the Division of Occupational Licensing and other entities does not state a violation of a liberty interest.   Such a report would only be actionable if it were false, but Plaintiff  acknowledges she was suspended and that her residency was not renewed.  *See Workman*, 32 F.3d at 481.

Defendants' causing to be published a false and stigmatizing statement to the ACGME that Plaintiff was dishonest might state a claim but Plaintiff does not allege who published that statement or that it occurred in the course of termination proceedings.   If Plaintiff is capable of making these specific allegations, she may amend her complaint to so state.[13]

Plaintiff's allegation that Dr. Allen caused to be published a statement "that there was justification for both the corrective action plan and non-renewal of the Plaintiff's residency and implying that the circumstances surrounding the Plaintiff's residency was depressing and sad," fails to state a violation of a liberty interest because the alleged statements do not impugn

_____

[13]  Unless discovery on this issue has already occurred, however, such an amendment will postpone the dispositive motion deadline and the trial in this matter.

Plaintiff's good name, reputation, honor, or integrity.

Statements must rise to a certain level before they can be considered stigmatizing enough to violate an employee's liberty interest.  Statements charging an employee with improper job performance, neglect of duties, insubordination, negligence, or dereliction in performance of her job duties are not stigmatizing and do not show a violation of a liberty interest.  Statements that an employee is under investigation when such statements are true is not stigmatizing and do not show a violation of a liberty interest.   It is likewise not enough that Plaintiff's termination alone makes her less attractive to future employers.   Statements that do rise to the level of a liberty interest violation generally involve charges of dishonesty or immorality.  Such charges directly attack the character and integrity of the plaintiff and attach to her like a "badge of infamy," making it difficult for a plaintiff to explain or justify them to future employers.[14]

The statements allegedly made by Dr. Allen are not false, there was justification for the corrective action plan and nonrenewal, and the circumstances surrounding Plaintiff's residency were depressing and sad.  Plaintiff may disagree with whether the justification was sufficient or even accurate but the statement made–that there was justification–is completely true.   In addition, the statement never rises to the level of accusations of dishonesty or immorality.  Dr.

---

[14] See *Garcia v. Albuquerque*, 232 F.3d 760, 772 (10th Cir. 2000) (stigmatizing allegations involve dishonesty or immorality); *Primas v. City of Oklahoma City*, 958 F.2d 1506, 1510 (10th Cir. 1992) (the mere statement that there is an investigation does not violate a liberty interest when there actually is an ongoing investigation); *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988) (neglect of duties and insubordination, even when considered false, do not call into question a person's good name, reputation, honor, or integrity, only charges of dishonesty or immorality qualify); *Sullivan v. Stark*, 808 F.2d 737, 739-740 (10th Cir. 1987) (statements charging an employee with negligence or dereliction in job performance not a liberty interest violation); *Asbill v. Housing Authority of the Choctaw Nation of Oklahoma*, 726 F.2d 1499, 1503 (10th Cir. 1984) (charge of disputing authority of a new agency director held not to stigmatize discharged employee).

Allen did not say that the corrective action plan was imposed or the contract was not renewed for stigmatizing reasons, he merely said reasons existed.  With regard to the second statement, "implications" are not actionable but even if they were, that the circumstances were depressing and sad is not false and is not stigmatizing.

Thus, Plaintiff has failed to state a constitutional violation or point to any clearly established law, thus entitling the Individual Defendants to qualified immunity on this claim.

*e.  Sixth Cause of Action–State Due Process and Free Speech Violations*

Plaintiff argues that Defendants' Due Process Policy failed to comply with the Utah Constitution and due process of law.  Defendants have moved to dismiss the due process component of this claim (and not the free speech component) for the same reasons that they are entitled to qualified immunity under federal law.   Utah offers a qualified immunity defense to state constitutional claims.  *See Spackman v. Board of Education of the Box Elder County School District*, 16 P.3d 533 (Utah 2000).

Under Utah's qualified immunity defense, a plaintiff must establish that he or she suffered a flagrant violation of his or her constitutional rights.  "In essence, this means that a defendant must have violated 'clearly established' constitutional rights 'of which a reasonable person would have known.'" *Id*. ¶ 23 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To be considered clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *Id*.  The requirement that the unconstitutional conduct be flagrant ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractability, or misjudgment without rendering him or herself liable for a constitutional violation.  *Id*.

For the same reasons that the Individual Defendants are entitled to qualified immunity with regard to plaintiff's federal due process claims, they are entitled to qualified immunity with regard to the state due process claims.   In short, there is no clearly established law that a medical resident was to be given more due process than Plaintiff was given.

C.     **Defendant Scott Smith's Motion to Dismiss the Claims Against Him in His Individual Capacity**

Scott Smith is the attorney from the University's Office of General Counsel who advised the University as to this situation involving Plaintiff.   Mr. Smith has joined in the above motion of the other Individual Defendants, and thus, the rulings discussed above also pertain to Mr. Smith.

Mr. Smith, however, also seeks dismissal of Plaintiff's First Amendment claims embodied the Second and Sixth Causes of Action because Plaintiff's allegations fail to tie Mr. Smith to those alleged deprivations.  Additionally, he seeks dismissal of Plaintiff's Ninth Cause of Action for intentional infliction of emotional distress because the alleged conduct was not extreme or outrageous.

Plaintiff alleges, in her Second and Sixth Causes of Action, that her First Amendment rights were violated.  Specifically, Plaintiff avers that the Individual Defendants, including Mr. Smith, terminated her residency in retaliation for Plaintiff having reported numerous concerns about the residency program. Amended Complaint, ¶ 64.  However, Plaintiff cannot establish that Mr. Smith caused Plaintiff's residency to be terminated because Mr. Smith had no authority over the terms or duration of Plaintiff's residency.

Mr. Smith, as an attorney at the University's Office of General Counsel, provides "legal advice to the institution's administration."  Amended Complaint ¶ 16.  Plaintiff alleges that Mr.

Smith also had "final policy making authority with respect to Plaintiff's education and employment." *Id.* This is a conclusory allegation, however, made without supporting facts and need not be accepted as true. *See, e.g., Erikson v. Pawnee County Bd. of County Comm.*, 263 F.3d 1151, 1154-55 (10th Cir. 2001). Moreover, this conclusory allegation is belied by the attachments to the Amended Complaint. The February 22, 2006 letter informing Plaintiff of the decision not to renew her residency contract, was signed by Dr. Stephen Hartsell and Dr. Susan Stroud, the directors of the emergency medicine residency program. Amended Complaint, Exhibit D. Additionally, Plaintiff's one-year contract was signed by Dr. Hartsell and the director of graduate medical education, Ms. Judi Short. Amended Complaint, Exhibit A. These attachments establish that the program directors, not Mr. Smith, were the final decision makers with regard to Plaintiff's residency. Thus, Plaintiff has failed to allege facts tying Mr. Smith to the deprivation of her First Amendment rights, and thus her First Amendment claims (embodied in her Second and Sixth Causes of Action) against Mr. Smith are dismissed.

To the extent Plaintiff claims that Mr. Smith was a co-conspirator in the alleged violation of her free speech rights, she has not alleged "specific facts showing an agreement and concerted action amongst the defendants." *Tonkovich v. Kan. Bd. of Regents,* 159 F.3d 504, 533 (10th Cir.1998); *Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) (affirming dismissal of conspiracy claim on a motion to dismiss, finding that."[c]onclusory allegations of conspiracy are insufficient to state a valid [section] 1983 claim."); *Cardoso v. Calbone* 490 F.3d 1194, 1199 (10th Cir. 2007). Accordingly, Plaintiff's conclusory allegations of a conspiracy are insufficient to state a § 1983 claim.

Plaintiff has also alleged a claim for intentional infliction of emotional distress claim, the

Ninth Cause of Action, against Mr. Smith.   The court finds, however, that Mr. Smith's alleged

conduct was not extreme, outrageous, and intolerable to the level of offending the generally

accepted standards of morality.   Under Utah law, a plaintiff must prove four elements to establish

an intentional infliction of emotional distress claim: (1) the defendant's conduct complained of

was outrageous and intolerable in that it offended generally accepted standards of decency and

morality; (2) the defendant intended to cause, or acted in reckless disregard of the likelihood of

causing, emotional distress; (3) the plaintiff suffered severe emotional distress; and (4) the

defendant's conduct proximately caused the emotional distress.   *Prince v. Bear River Mut. Ins.*

*Co.*, 56 P.3d 524, 535-36 (Utah 2002) (quotations and citation omitted).

The Utah Supreme Court has held that a court may decide whether a claim for intentional

infliction of emotional distress is sufficient as a matter of law.   *Bennett v. Jones, Waldo,*

*Holbrook & McDonough*, 70 P.3d 17, 33 (Utah 2003) (affirming trial court's dismissal of

plaintiff's fourth amended complaint where plaintiff failed to plead facts indicating defendants'

conduct was sufficiently extreme, outrageous, and intolerable as a matter of law); *see also*

*Coroles v. Sabey*, 79 P.3d 974, 983 n.18 (Utah Ct. App.  2003).   A plaintiff must establish

conduct that "evokes outrage or revulsion; it must be more than unreasonable, unkind, or unfair."

*Prince*, 56 P.3d at 536 (quotations and citation omitted).   "Additionally, conduct is not

outrageous simply because it is tortious, injurious, or malicious, or because it would give rise to

punitive damages, or because it is illegal." *Id*. (quotations and citation omitted).  Here, Plaintiff

alleges that Mr. Smith (1) delayed the production of a letter of certification, and (2) failed to

safeguard her procedural rights in a hearing where she was represented by her own counsel. This

alleged conduct cannot support a claim for intentional infliction of emotional distress.  At most,

the conduct that Plaintiff has alleged is merely "unreasonable, unkind, or unfair."  *Prince*, 56

P.3d at 536 (quotations and citation omitted).  Accordingly, Plaintiff's Ninth Cause of Action

against Mr. Smith is dismissed.[15]  In addition, because all claims against Mr. Smith have been

dismissed, the pending discovery motions are denied as moot.

## IV. CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. The Defendant University of Utah Medical School's Motion to Dismiss [docket # 71]

is GRANTED, and all claims against the University of Utah Medical School are DISMISSED

without prejudice, except, as noted below, the § 1983 claims against the University are

DISMISSED with prejudice;

2.  The Medical School and Individual Defendants' Motion to Dismiss [docket #51] is

GRANTED in part and DENIED in part.  The § 1983 claims against the Medical School are

DISMISSED with prejudice.  In addition, the Individual Defendants, insofar as they are sued in

their official capacities, are dismissed from this action, with the exception of the Tenth Claim for

Relief, to the extent it seeks prospective injunctive relief.   Plaintiff's First, Third, Fourth, Fifth

and Sixth Causes of Action (due process portion) are DISMISSED with prejudice, with the

exception of a small portion of Plaintiff's Fifth Cause of Action, noted above, which is dismissed

without prejudice;

3.  Defendant Scott Smith's Motion to Dismiss [docket #54] is GRANTED, and the

claims against Mr. Smith are DISMISSED with prejudice;

4.  Plaintiff's pending Motion to Compel Discovery and for Sanctions [docket # 98] is

---

[15]  The other Individual Defendants did not move to dismiss this claim, and thus,
Plaintiff's claim for intentional infliction of emotional distress remains against them.

DENIED AS MOOT, and Defendant's Motion for Protective Order [docket # 94] is also MOOT;

     5.   Plaintiff may pursue her Second Cause of Action (First Amendment), the portion of her Sixth Cause of Action pertaining to Free Speech under the Utah Constitution, her Ninth Cause of Action (Intentional Infliction of Emotional Distress) against the Individual Defendants except for Mr. Smith, and her Tenth Cause of Action to the extent it seeks prospective injunctive relief;

     6.   The Order dated August 30, 2007, imposing a stay in this case, is VACATED and the stay is now LIFTED.

     DATED this 28th day of September, 2007.

                          BY THE COURT:

                          DALE A. KIMBALL
                          United States District Judge